IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,           )
                                    )
            Respondent,             )
                                    )
vs.                                 )       Case No. 07-CR-122-GKF
                                    )       Civil Case No. 08-CV-687-GKF
RICHARD DALE MONTGOMERY,            )
                                    )
            Petitioner.             )

## REPORT AND RECOMMENDATION

        This matter has been referred to the undersigned United States Magistrate Judge

to conduct an evidentiary hearing related to petitioner Richard Dale Montgomery's pro se

motion under 28 U.S.C. § 2255 to vacate, set aside or correct sentence by a person in

federal custody.[1]  [Dkt. # 70, 94].  On April 12, 2010, the district court entered an Opinion

and Order finding that petitioner was entitled to an evidentiary hearing on his claim that his

trial attorney, Gary Ward, provided ineffective assistance by failing to obtain and present

certain evidence during trial, by failing to call certain witnesses at the sentencing hearing,

and by failing to file a direct appeal.  [Dkt. # 94 at 19].  The district court appointed the

Federal Public Defender's Office ("FPD") to represent petitioner at this stage of the

proceeding.  [Dkt. # 94 at 19].  On January 27, 2011, attorney Barry Derryberry (FPD)

entered an appearance on behalf of petitioner.  [Dkt. # 106].  The undersigned conducted

---

[1] Mr. Montgomery was convicted by a jury on September 20, 2007.  He was found
guilty of coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b).  [Dkt. # 13,
58].  On December 19, 2007, Mr. Montgomery was sentenced to the statutory minimum
of 120 months imprisonment, followed by a seven year term of supervised release.  [Dkt.
# 66].  Mr. Montgomery did not file a direct appeal from the sentence and judgment
imposed.

an evidentiary hearing on May 5 and 23, 2011. [Dkt. # 124, 127].[2] Based on the testimony and exhibits adduced at the hearing, and the briefs and arguments of counsel, the undersigned recommends that Mr. Montgomery's § 2255 petition be DENIED.

## Standard of Review

To prevail on a claim of ineffective assistance of counsel, Mr. Montgomery must establish two elements: "First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). The court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. "Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment." Id. at 691. A defendant carries the burden to make both showings, and unless this burden is meet, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

## Issues Under Review

First:     Whether Mr. Ward rendered ineffective assistance by failing to obtain an alleged 50 chat room contacts between the defendant and Detective Ian Buchanan and present the

_____

[2] A two volume transcript of the evidentiary hearing is of record. [Dkt. # 126, 131].

evidence at trial.

Second: Whether Mr. Ward rendered ineffective assistance by failing to comply with Mr. Montgomery's alleged request to call four character witnesses at the sentencing hearing as mitigating evidence.

Third: Whether Mr. Ward rendered ineffective assistance by his alleged failure to comply with Mr. Montgomery's request to file a direct appeal from his conviction and sentence.

## Analysis

**The Alleged Missing Chats**

As his first issue, Mr. Montgomery alleges Mr. Ward failed to obtain, and present at trial, evidence of 50 chats between him and undercover agent Detective Buchanan.[3] Mr. Montgomery contends he needed the missing chats at trial for two reasons. First, he contends the missing chats would have established that the government initiated contact with him, supporting his entrapment defense (which relied on the premise that Mr. Montgomery did not have a predisposition to commit the crime and that the government consistently initiated chats with him.) Mr. Montgomery testified that his computer was on a default setting which should have archived the chats between him and Detective Buchanan, at least for approximately six weeks. [Tr. Vol. II at 22-23]. Mr. Montgomery testified that on the date of his initial contact with Detective Buchanan, there were 40 or 50 people active in the chat room, and he was talking with some of them using instant messages. [Tr. Vol. II at 15]. Mr. Montgomery testified that he posted a message greeting the officer (who was posing as a thirteen year old girl using the name "fastpitchdebbie"),

_____

[3] At the hearing, Mr. Montgomery testified that he told Mr. Ward that there were probably 30 to 40 chats missing. [Tr. Vol. II at 44].

that they chatted, and that the officer asked if it would be okay to add him as a "friend" on Yahoo!. Mr. Montgomery testified that he did not ask the officer his age, sex, and location prior to agreeing to his "friend" request. [Tr. Vol. II at 15-6]. Second, Mr. Montgomery claims the missing chats would establish that he believed he was engaging in role playing with an adult who was acting like a minor, rather than engaging in sexual conversations with a minor.

Mr. Montgomery contends Mr. Ward rendered ineffective assistance in not obtaining the hard drive when it became available prior to trial and in failing to move for a continuance of trial so that he could conduct an independent analysis of the hard drive. Mr. Montgomery testified that the computer hard drive would have shown that the government: (1) failed to produce 30 days of chats, (2) failed to obtain a complete copy of exchanged chats, (3) solicited him to send photographs of himself, (4) depicted chats out of chronological sequence, (5) initiated all chats except three, and (6) urged him to stop pretending and meet in person. [Tr. Vol. II at 6, 20-1,27, 29-32, 43, 45, 52]. Mr. Montgomery contends a defense expert would have had access to the pagefile.sys files where chats existed and could have performed a search for terms relevant to his theories of defense. [Dkt. # 136 at 6].

Detective Buchanan testified that he is employed by the Broken Arrow Police Department and works as a part-time undercover agent with the FBI's Innocent Image Task Force to detect online exploitation of children. [Tr. Vol. II at 54]. Detective Buchanan has worked in the latter capacity for six years. On January 23, 2007, Detective Buchanan created online identities as "fastpitchdebbie" and "debbie hair," entered a chat room called "Oklahoma Romance," [Tr. Vol. II at 15] and waited for contact from others. [Tr. Vol. II at

55].  Detective Buchanan testified that between 10 and 20 people initiated contact with him and that in the chat room environment there are often four or five different conversations going on at the same time.  Generally, people send a message asking where another is from and their age, and some persons attempt to send photographs and videos.  [Tr. Vol. II at 55].  Detective Buchanan testified that Mr. Montgomery inquired regarding fastpitchdebbie's age, sex, and location.  On that date, Detective Buchanan was posing as a thirteen year old girl from Tulsa, Oklahoma.  [Tr. Vol. II at 56].  Detective Buchanan testified that Mr. Montgomery sent him a request to become "friends" on Yahoo!.  For approximately six months thereafter, Detective Buchanan and Mr. Montgomery communicated in the Yahoo! chat environment.  [Tr. Vol. II at 8].

The following facts are undisputed:  Prior to trial Mr. Ward tried to obtain Mr. Montgomery's hard drive in order to conduct an independent analysis.  [Tr. Vol. II at 19].  During his chats with Detective Buchanan, Mr. Montgomery engaged in conversations of a sexually explicit nature.  [Tr. Vol. II at 47].  The chat transcripts entered into trial evidence were accurate depictions of the chats that took place on the dates and times identified on the transcripts.  [Dkt. # 136 at 4, Tr. Vol. II at 40].  Mr. Montgomery sent fastpitchdebbie two photographs, including one of his penis.  [Tr. Vol. II at 21, 181].  Mr. Montgomery agreed to meet fastpitchdebbie at the Bass Pro Shop in Broken Arrow.  [Tr. Vol. II at 137].  Mr. Montgomery traveled to the designated meeting place, where he was arrested.  [Tr. Vol. II at 137].

The undersigned finds that Mr. Montgomery has not shown that Mr. Ward's performance was deficient at the time of trial in failing to obtain Mr. Montgomery's computer hard drive and in failing to move for a continuance in order to have the hard drive

independently examined by a forensic expert. It is undisputed that Mr. Ward used due diligence in attempting to obtain the hard drive prior to trial and that it was only on the morning of trial that he was informed that a preliminary analysis of the computer was completed. It is also undisputed that no pornography was found on the hard drive, that the computer contained no evidence to show that defendant had any interest in exploiting a minor, and that the government would not be offering into evidence any data discovered on the hard drive. There is also no evidence that Mr. Ward was informed prior to the trial that Mr. Montgomery's hard drive was available for an independent analysis. Mr. Ward testified that although he tried to obtain the hard drive prior to trial, he did not do so after the trial commenced, because he was not sure he could have the hard drive examined in the brief span of the actual trial. [Tr. Vol. I at 67]. In fact, prior to trial, Mr. Ward contacted people with forensic experience in analyzing hard drives, obtained a quote, and determined their availability to conduct the analysis if the hard drive had been delivered to him in sufficient time prior to the commencement of trial. [Tr. Vol. I at 51]. At no time during the course of the trial did the government deliver Mr. Montgomery's hard drive to Mr. Ward. [Tr. Vol. I at 60].

Additionally, Mr. Ward testified that he consulted with Mr. Montgomery regarding whether to delay the trial, and Mr. Montgomery agreed with the decision to go forward. Mr. Montgomery told Mr. Ward that he was anxious to commence the trial because he had been detained in the county jail for a significant period of time and because of the economic hardship on his family. [Tr. Vol. I at 68]. Although Mr. Montgomery had expressed some unease going forward with the trial without an independent examination of the hard drive, Mr. Ward testified, "I wouldn't have announced ready for trial had Mr.

6

Montgomery not agreed to proceed forward to trial at that time." [Tr. Vol. I at 69].

Mr. Ward testified that he had frequent communications with Ed Snow, the AUSA assigned to the case. Mr. Ward felt AUSA Snow was very forthcoming and that there was no effort to avoid contact with Mr. Ward. [Tr. Vol. I at 71]. Mr. Ward had no reason to believe that AUSA Snow had not fully complied with his discovery obligations. [Tr. Vol. I at 117]. Mr. Ward believed the government had provided him with all transcripts of the chat exchanges between Mr. Montgomery and Detective Buchanan. [Tr. Vol. I at 118]. Moreover, Mr. Ward went as far as to issue a subpoena to Yahoo! to obtain copies of Mr. Montgomery's chats. Although Yahoo! responded to his subpoena, it did not produce anything of substance. [Tr. Vol. I at 118-9]. Moreover, Mr. Ward testified that Mr. Montgomery never indicated to him that there were 40 to 50 missing chats. [Tr. Vol. I at 121]. Rather, Mr. Montgomery indicated there might be one to three missing chats early on in their communication. [Tr. Vol. I at 123]. AUSA Snow collaborated Mr. Ward's testimony. Mr. Snow testified that at the time of trial, he had produced to the defense all discovery, including all chat logs. [Tr. Vol. II at 161]. Mr. Ward testified that he was very interested in obtaining the initial instant messaging between his client and the officer but that he was aware of the difficulty in capturing instant messaging. [Tr. Vol. I at 58]. AUSA Snow testified that if there had been any exculpatory evidence, he would have immediately turned it over to Mr. Ward. [Tr. Vol. II at 164]. AUSA Snow specifically requested that his agents attempt to retrieve the first chat exchange, but their efforts were not fruitful. [Tr. Vol. II at 163-4].

Based on the foregoing, Mr. Ward's performance, as it related to the alleged missing chats, was certainly not deficient. Mr. Montgomery had counsel, as was his right under the

Sixth Amendment.

Even assuming Mr. Ward's performance had been deficient, the evidence establishes that Mr. Montgomery was not prejudiced by Mr. Ward's failure to obtain the hard drive prior to trial, because there is no evidence that the outcome of the trial would have been different. The only evidence to support Mr. Montgomery's testimony that Detective Buchanan initiated the "friend" request, is Mr. Montgomery's own testimony. His testimony was disputed by Detective Buchanan. [Tr. Vol. II at 55-6]. More importantly, the evidence established that the initial chat exchange was not stored in the archives of Mr. Montgomery's computer at the time it was seized by government agents. Mr. Montgomery testified that he had archived his chat exchanges for six weeks before he closed the Yahoo! archive feature on his computer, but he admitted that on January 23, 2007, the date of his initial contact with Detective Buchanan, there were 40 or 50 people active in the chat room, and he was chatting with more than one of them on instant messenger. [Tr. Vol II at 15]. Further, Detective Buchanan testified that, at best, it was speculative whether the initial chat was captured on Mr. Montgomery's hard drive at all and that if it had been saved, it would have overwritten itself with other chats which occurred in the ensuing six months. Specifically he testified:

> Even if it were stored that way, that information is constantly overwriting itself because you only have a certain capacity for storage in your hard drive. Your hard drive is only a certain amount – can only hold a certain amount of data. You're talking about six months of online shopping, doing whatever he was doing. Even if it did store there, it would have been overwritten unless it was specifically saved.

[Tr. Vol. II at 88-89]. Buddy Carter, a computer forensic examiner with the FBI offered substantiating testimony. Agent Carter testified that Yahoo! chat logs are generally

archived in the user.dat file and that he did not discover any saved chats in Mr. Montgomery's user.dat file. [Tr. Vol. II at 108-9, 131]. He did locate some text streams in the pagefile.sys file using the search terms "fastpitchdebbie, debbie hair, montyhd1200 and DR" in the Yahoo! IDs. [Tr. Vol. II at 107, 109, 112,120]. However, the form of the data was in computer code and mostly unreadable. Agent Carter testified:

> They were not contiguous. It was chunks of, looked like, user names with chat stuff. But it wasn't all in order, so it was – stuff had been overwritten and there was computer code. I don't read computer code a lot. So there were snippets of it in different locations.

[Tr. Vol. II at 112]. Thus, the evidence establishes that the hard drive did not contain discernible chat dialogues. Even if Mr. Montgomery used additional search terms and somehow retrieved additional chats, the evidence established that those additional chats would have no evidentiary value.

FBI Special Agent Joseph Cecchini, the case agent, offered corroborating testimony. Agent Cecchini testified that Mr. Montgomery's computer hard drive did not contain any pornography or any relevant and legible chats. Specifically, Agent Cecchini testified:

> I understand that he [Agent Carter] found no evidence of child pornography . . .He found pieces or chunks of chats that were associated with, I think it was, fastpitchdebbie and debbie hair. There may have been one other search term in a file called pagefile.sys. which he had to explain to me what that meant and now it worked. There was nothing that was readable or visible that I could read in a contiguous, continuous manner. It was like chunks of junk.

[Tr. Vol. II at 143-4]. Agent Cecchini testified that he informed AUSA Snow that there was no child pornography found on the hard drive and "there was no chat that was valuable." [Tr. Vol. II at 144]. AUSA Snow testified that because he knew Mr. Montgomery had turned

off the archive function on his computer he was not surprised to find there were no retrievable chats. He said:

> We knew that Mr. Montgomery had turned off all his chat because he had told Agent Buchanan online how to get rid of that stuff. So we didn't expect to find it and I think that's pretty much what we found is bits and pieces.

[Tr. Vol. II at 167-8].

Further, government's hearing Exhibits Nos. 6, 7, 9, 11-14, impeached Mr. Montgomery's claim that there were 40 to 50 missing chats that the government failed to produce. Detective Buchanan testified, and documented various reasons, why he was not online on certain of the dates that Mr. Montgomery claims the two were sending the unrecovered chats (e.g., training [Ex. Nos. 7, 8], field work [Ex. No. 7], vacation leave [Ex. Nos. 7, 13], and renewing permission for continued FBI undercover work [Ex. No.14]). [Tr. Vol. II at 66-75]. Detective Buchanan further testified that no chats occurred between him and Mr. Montgomery on the remaining dates that Mr. Montgomery claims there are missing chats. Detective Buchanan testified that all their chats were captured and/or properly documented on an FBI-302 form. [Tr. Vol. II at 76].

Agent Carter testified that during his examination of the computer hard drive, every necessary action was taken to preserve the status quo to make certain nothing could be changed on the drive. [Tr. Vol. II at 97]. He further testified that he captured an image of the hard drive prior to his examination and conducted his work on the image rather than the hard drive itself.[4] [Tr. Vol. II at 98]. He also verified the "hash." "[T]he hash is used

---

[4] The parties entered into a stipulation that Mr. Montgomery is not claiming that his hard drive was wiped clean before the government returned it to Mrs. Montgomery. His claim is only that the data could not be retrieved from the hard drive. [Tr. Vol. II at 104].

to make sure nothing's changed and it's also used to verify that what you start with is what you end with during a forensic examination." [Tr. Vol. II at 97]. Agent Carter said his forensic examination was completed on September 24, 2007. [Tr. Vol. II at 116]. The image of the hard drive was submitted to the Oklahoma City evidence control technician on October 2, 2007. [Tr. Vol. II at 117-8]. Trial in this case commenced on September 17, 2007. [Dkt. # 49].

There is also no evidence of any conduct by the government or by Mr. Ward which would have caused the data on Mr. Montgomery's hard drive to be unretrievable. However, the evidence did establish that the hard drive was not treated with great care after it was returned to Mrs. Montgomery. Mrs. Montgomery received the hard drive from the FBI on August 6, 2008 and "threw it in the back of [her] truck" along with other stuff. [Tr. Vol. I at 147]. She moved it to her home in Choctaw, Oklahoma, then to an apartment for a year-and-a half and then moved it to Moore, Oklahoma. [Tr. Vol. I at 152-3]. She had possession of the hard drive from 2008 until January, 2011, when she gave it to her daughter's boyfriend, Andrew Burnett, to see if he could retrieve some family photos from it. [Tr. Vol. I at 152-5]. Mr. Burnett is employed by a dialysis company located in Nashville, Tennessee. Mr. Burnett shipped the hard drive from Moore, Oklahoma to Nashville, Tennessee. [Tr. Vol. I at 154]. Mr. Burnett took the hard drive to a friend who tried to retrieve the photos, by using a "special machine." [Tr. Vol. I at 155]. Mrs. Montgomery testified that her only interest in obtaining the hard drive was to retrieve family photos. [Tr. Vol. I at 153]. Mrs. Montgomery asked for the return of the hard drive, at Mr. Montgomery's request, in preparation for the evidentiary hearing. [Tr. Vol. I at 148]. It was then shipped to Tulsa, Oklahoma.

At the beginning of the hearing on May 5, 2011, Mr. Derryberry advised the undersigned that he had obtained Mr. Montgomery's hard drive and was endeavoring to analyze it but had run "into problems getting into it at all." [Tr. Vol. I at 3]. Mr. Derryberry was granted additional time to complete his examination. At the beginning of the hearing on May 23, 2011, Mr. Derryberry stated:

> I've been on about a six-week ordeal with a computer issue and it's completed and the real upshot of it is I won't have any additional witnesses that bear on that issue. And in addition, the Government and ourselves have a stipulation which is that the computer is broken for lack – the hard drive is broken for lack of a more technical reason to account for the issue and cannot be accessed.

[Tr. Vol. II at 3]. Thus, it is apparent that Mr. Montgomery had the availability to examine his hard drive since January 2008, when it was returned to Mrs. Montgomery at Mr. Montgomery's request. Mr. Montgomery did not avail himself of that opportunity for three years. The undersigned finds that Mr. Montgomery has failed to meet his burden of showing that there were 40 to 50 missing chats between himself and Detective Buchanan; thus, no prejudice is shown.

The undersigned finds that plaintiff has failed to meet his burden on his first claim. The undersigned finds unreliable Mr. Montgomery's claim that Detective Buchanan initiated contact with him. Mr. Montgomery has also failed to show that the outcome of his trial would have been different if Mr. Ward had retrieved a copy of the initial instant messaging between him and Detective Buchanan. Further, Detective Buchanan conceded that he initiated most of the chats after the initial contact. [Tr. Vol. II at 60]. He testified that all other chats were documented as they occurred. [Tr. Vol. II at 76]. The jury was provided an entrapment instruction and rendered its decision based on the trial evidence. [Dkt. #

59 at 28].  Mr. Montgomery had his day in court on his theory of entrapment.  Thus, no prejudge is shown.

The undesigned finds that Mr. Montgomery also failed to meet his burden of showing that the 40 to 50 missing chats would show that he was role playing with an adult acting as a juvenile.  The undersigned finds Mr. Ward's testimony credible that Mr. Montgomery never advised him that there were more than one to three missing chats.  Mr. Montgomery's credibility is impeached by his own deceitful conduct and by the testimony of his wife and his friends.  Their testimony clearly established that Mr. Montgomery led a double life, that he was deceptive, and that he successfully concealed his illegal conduct from his wife and closest friends.  Additionally, Detective Buchanan testified that Mr. Montgomery had pursed unlawful sexual contact with another minor girl and had gone so far as to telephone the young girl and represent to her and her father that he was a seventeen year old boy.  [Dkt. # 29 at 2-3].  Thus, Mr. Montgomery has failed to show that Mr. Ward was deficient in his representation at trial or that he was prejudiced by Mr. Ward's purported failure to obtain missing chats and present them at trial.

**Failure to Call Character Witnesses**

As his second issue, Mr. Montgomery contends Mr. Ward rendered ineffective assistance in failing to comply with his request to call four character witnesses as mitigating evidence during his sentencing hearing.  He identified Lindsey Flowers Liles, Leslie James Bishop, Ray Sikes and John Gulick as witnesses that he asked Mr. Ward to call at the hearing.  Mr. Montgomery testified that these witnesses had been in the presence of his family and could "bring light on the character that I was with them around."  [Tr. Vol. I at 165].  Significantly, Mr. Montgomery testified that Mr. Ward never told him that he would

13

not call these witnesses. Rather, he testified that the witnesses were unable to drive to Tulsa from Oklahoma City on the day of his sentencing because there was an ice storm in Tulsa.

> Derryberry: After you made that request to Mr. Ward, did he tell you any decision that he had made regarding that request?
>
> Petitioner: No.
>
> Derryberry: He didn't tell you if he was going to call them or not call them?
>
> Petitioner: No, because on the day of the sentencing there had been an ice storm two days before on Sunday, December 9th . . . .all witnesses I had were in Oklahoma City, 100 miles away, and they couldn't be there. . .they were all planning to come to the sentencing hearing on December 11th.

[Tr. Vol. I at 165-6]. At best, Mr. Montgomery's testimony establishes that his potential character witnesses were unavailable to testify due to extreme weather conditions.

Further, Mr. Montgomery has failed to show that he was prejudiced by Mr. Ward's purported failure to call these witnesses at sentencing. Lindsey Liles testified at the evidentiary hearing that she is a friend of Mr. Montgomery's daughter Tiffany, that they are the same age, and that they were neighbors and had been friends since they were 5 to 6 years old. She testified that she spent the night with Tiffany on 25 to 30 occasions and Mr. Montgomery never did, or said, or gave the appearance of anything to cause her to be uncomfortable. [Tr. Vol. I at 25-6]. She testified that she does not know how she would have felt at the time if she knew Mr. Montgomery was engaged in sexual internet chatter with a minor. [Tr. Vol. I at 28-9].

Leslie James Bishop testified at the evidentiary hearing that he is Mr. Montgomery's

second cousin, that he has known Mr. Montgomery for 23 years, and that they worked together at Tinker Air Force Base. [Tr. Vol. I at 30-1]. He observed Mr. Montgomery in the presence of children on five occasions. [Tr. Vol. I at 32]. He testified that he was unaware that Mr. Montgomery was interested in sex with underage girls and that had he known, he "would have probably disowned him." [Tr. Vol. I at 32].

Ray Sikes is pastor at the First Baptist Church of Choctaw. He testified at the evidentiary hearing that he has known Mr. Montgomery for 15 years as a member of his church and as a friend. [Tr. Vol. I at 34]. Pastor Sikes said that he had observed Mr. Montgomery at church and in his home and had never witnessed anything suspicious or any inappropriate interest in young girls. [Tr. Vol. I at 35]. Pastor Sikes testified that Mr. Montgomery never confided in him that he was engaging in internet chats seeking sex with underage girls. [Tr. Vol. I at 36].

John Gulick testified at the evidentiary hearing that he had been neighbors with Mr. Montgomery since 1995. [Tr. Vol. I at 38]. He had spent the night with Mr. Montgomery and his family at his cabin. He never observed Mr. Montgomery say or act inappropriately regarding young girls or his own daughters. [Tr. Vol. I at 38]. Mr. Gulick testified that had Mr. Montgomery confided in him a sexual interest in underage girls, he would have told Mrs. Montgomery. [Tr. Vol. I at 39].

Mr. Montgomery concedes that he received the mandatory minimum statutory sentence of 10 years and that Mr. Ward could not have successfully argued for a lower term of imprisonment. [Tr. Vol. I at 157]. Mr. Montgomery was sentenced to a seven year term of supervised release. He was facing a supervised release term ranging from five years to life. Mr. Montgomery contends the testimony of these four character witnesses

would have reduced his term of supervised release and eliminated some of the Special Sex Offender Conditions imposed in General Order 99-17, adopted by this Court on July 13, 1999. [Ex. 35]. Mr. Montgomery contends Mr. Ward did not advise him of the Special Sex Offender Conditions until after he was sentenced. Mr. Montgomery contends these four witnesses would have established his credibility and negated any inference of a possible future threat to young girls.

Mr. Ward testified that prior to sentencing he discussed with Mr. Montgomery the legal terms "mitigation and aggravation." [Tr. Vol. I at 80]. Mr. Ward testified that he and Mr. Montgomery had "very specific conversations about who we were going to call and not going to call and they were called or not called with Mr. Montgomery's express permission, knowledge and consent." [Tr. Vol. I at 126]. Mr. Ward testified that if Mr. Montgomery had said he wanted a certain witness to testify, that he would have called that witness. [Tr. Vol. I at 87, 126]. Mr. Ward testified that at the close of his discussion with Mr. Montgomery about whether to call witnesses at the sentencing hearing, Mr. Montgomery did not instruct him to call any witnesses. [Tr. Vol. I at 126]. Mr. Ward acknowledged that whether to call a witness at the sentencing hearing is a strategic decision. [Tr. Vol. I at 126]. Mr. Ward acknowledged that the trial judge, District Judge Greg Frizzell, had heard trial testimony that Mr. Montgomery had never acted inappropriately toward preteen girls. He testified that it was his observation at the time that Judge Frizzell probably viewed Mr. Montgomery's behavior as aberrant conduct and that he probably did not view Mr. Montgomery as a child molester. Specifically, Mr. Ward testified:

> Yeah, that was part of the trial testimony. And just to build on that, I did not believe that Judge Frizzell looked disfavorably on Mr. Montgomery as a person, only as to that instance of conduct, because I thought Judge Frizzell

16

> probably had a pretty clear picture that this was an aberrant conduct even for Mr. Montgomery, that he wasn't a child molester, that he didn't collect child pornography. I think Judge Frizzell formed that opinion during the course of the trial.

[Tr. Vol. I at 127]. Mr. Ward testified that it is speculative whether additional witnesses would have affected the term of supervised release imposed by the District Court and whether Judge Frizzell would have broken from protocol on the terms of the Special Sex Offender Conditions but he concluded, "Could have, but I don't think it would have changed." [Tr. Vol. I at 128]. Mr. Ward testified that if a client would have asked him about seeking a modification of the Special Sex Offender Conditions imposed during supervised release, he would have advised his client that they are imposed as a matter of course because that is the purpose of a General Order. [Tr. Vol. I at 128]. In this instance, Mr. Ward testified that he did not read the specific conditions of supervised release to Mr. Montgomery so he was not aware of the specifics, but Mr. Montgomery was aware there would be conditions to his supervised release. [Tr. Vol. I at 98].

The undersigned finds that Mr. Montgomery has not met his burden to show that Mr. Ward's performance was deficient in not calling witnesses at the sentencing hearing. Mr. Ward had a duty to consult with Mr. Montgomery on important decisions and to keep him informed of developments in the course of his proceedings. See Strickland, 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."). The evidence clearly established that Mr. Ward consulted Mr. Montgomery on whether to call witnesses at the sentencing

hearing. Mr. Montgomery has not overcome the presumption that, under the circumstances of this case, the decision not to call character witnesses at the sentencing hearing might be considered sound trial strategy. See id. at 689.

Moreover, the undersigned finds that Mr. Montgomery has not shown that he has been prejudiced by Mr. Ward's failure to call the identified character witnesses at his sentencing hearing. Mr. Ward called two witnesses to testify at trial, Mrs. Montgomery and a long time friend of petitioner's daughter, Christine Ward. [Dkt. # 98 at 461-476, Dkt. # 99 at 498-516]. Both witnesses testified that defendant did not give the appearance of being a threat to young girls. A summary of the trial testimony of Mrs. Montgomery and Ms. Ward follows.

Ms. Ward testified that Mr. and Mrs. Montgomery have two daughters, Tiffany and Melissa. Tiffany is 24 years old, the same age as Ms. Ward, and has been her friend since she was 12 years old, when her family moved into the Montgomery's neighborhood. [Dkt. # 98 at 462-3]. She and Tiffany spent a lot of time together, much of it in the Montgomery's home. The vast majority of the time that she was at the Montgomery's home, Mr. Montgomery was present. [Dkt. # 98 at 464]. Ms. Ward testified that ten teenage girls would stay the night at the Montgomery home during slumber or birthday parties. Mr. Montgomery never gave her any reason to feel uncomfortable or any indication of a sexual interest in her. [Dkt.# 98 at 465 ]. Mr. Montgomery never acted or behaved or said anything which she deemed to be inappropriate. [Dkt. # 98 at 465]. She observed Mr. Montgomery interact with other young girls. She viewed him as a second father and a lot of the girls who spent time at the Montgomery's house viewed him that way. [Dkt. # 98 at 465]. Ms. Ward could not foresee in Mr. Montgomery any predisposition

or desire to have sex with minors. [Dkt. # 98 at 466]. When asked if she knew Mr. Montgomery had internet sexual conversations with another young female, Ms. Ward testified it would not change her opinion that Mr. Montgomery was not predisposed to having sexual contact with underage girls. [Dkt.# 98 at 476].

Defendant's wife, Beverly Montgomery testified that during their 27 years of marriage, she never had any reason whatsoever to suspect that her husband might have an interest in having sex with minors. [Dkt. # 99 at 499-0]. Young girls were in and out of their home "all the time" and she never saw any inappropriate conduct between him and any minor. [Dkt. # 99 at 500]. Mrs. Montgomery talked to her husband about another girl that he was talking with online that was a minor. [Dkt. # 99 at 509]. He told her that he was going to Tulsa to have sex, but that it was with an adult woman. [Dkt. # 99 at 510]. Mr. Montgomery admitted to his wife that he talked to several other women on line. [Dkt. # 99 at 512]. He said he was having oral sex with other women and that he did not need a condom. [Dkt. # 99 at 512-13]. Mrs. Montgomery admitted that there was a "whole different side to [her] husband's life that [she] didn't know about." [Dkt. # 99 at 513].

At the hearing, Mr. Montgomery testified that he wanted the four above-mentioned witnesses to testify at sentencing to his good character. [Tr. Vol. I at 165]. However, as shown by the above summary of the trial testimony of Ms. Ward and Mrs. Montgomery, Judge Frizzell heard substantially the same testimony at trial and, at best, the proposed sentencing witnesses would have offered only cumulative evidence. Moreover, had Mr. Ward called one or more of the proposed sentencing witnesses, AUSA Snow testified that he would have called the other child victim to testify that Mr. Montgomery also had conversations of a sexual nature online with her. [Tr. Vol. II at 170]. AUSA Snow testified

that he had evidence to impeach Mr. Montgomery's purposed good character, such as evidence that Mr. Montgomery was engaging in sexual relations with other adult women that he had met online and that he was eliciting sexual contact with another minor. He testified that Judge Frizzell was aware that there was another child victim and that he would have brought her to court to testify about the situation. [Tr. Vol. II at 171]. AUSA Snow testified he would have presented this evidence to show that Mr. Montgomery posed a continuing threat to young girls.

The undersigned finds credible Mr. Ward's testimony that Mr. Montgomery did not ask him to call witnesses at the sentencing hearing. In addition, the undersigned finds no prejudice in failing to call these witnesses at sentencing. Character evidence was admitted during the trial and Judge Frizzell, the sentencing judge, heard evidence at trial regarding Mr. Montgomery's character around his friends and family. Further, by foregoing the opportunity to present cumulative character evidence, Mr. Ward prevented the government from putting on the testimony of the other minor girl who would have provided details of her online chats with Mr. Montgomery. This latter evidence was potentially damaging and was the subject of a response filed by the government to a defense motion under Fed. R. Evid. 404(b). [Dkt. # 24, 29]. In the 404(b) response brief, the government proffered that Mr. Montgomery had telephoned the home of his second victim, who was fifteen years old, spoke to the victim's father and represented himself to be a seventeen year old boy. Such evidence would clearly impeach the witness' claim that he was not a threat to minor girls. [Tr. Vol. II at 169-70, Dkt. # 29 at 2-3]. Had the government been able to offer this evidence, Mr. Montgomery may have received an increased term of supervised release, since there would have been evidence that his contact with fastpitchdebbie was not an

isolated act.

Additionally, Judge Frizzell gave the jury a character evidence instruction at the conclusion of Mr. Montgomery's trial. [Dkt. # 59 at 15]. The jury had the opportunity to consider Mr. Montgomery's reputation for having a good character in deliberations and in rendering their verdict, and apparently rejected it. Thus, Mr. Montgomery had his day in court on the issue of his character. Finally, AUSA Snow testified that he wanted Mr. Montgomery to be on supervised release for life because there had been two child victims. [Tr. Vol. II at 170]. Clearly, the government would have put forth a great effort to defeat any claim by Mr. Montgomery that he did not pose a future threat to young girls. Thus, no prejudice has been shown.

**Failure to Appeal**

As his third issue, Mr. Montgomery contends that he asked Mr. Ward to file a direct appeal from his conviction and sentence and that Mr. Ward refused to do so. Mr. Ward testified that he met with Mr. Montgomery between the jury verdict and sentencing and that he discussed with Mr. Montgomery whether to file an appeal. [Tr. Vol. I at 92-3, 95]. In fact, Mr. Ward testified that they discussed whether to file a notice of appeal every time Mr. Ward visited Mr. Montgomery in jail prior to sentencing. [Tr. Vol. I at 95]. Mr. Ward summarized the discussions which took place:

> I wouldn't say he had a position. It's a discussion. It's an ongoing discussion. I'm telling him and he's listening and he's expressing his opinion and I'm expressing my opinion. I don't think he had a position, 'This is what we are going to do,' prior to imposition of sentence.
>
> . . . .
>
> [I]t was an ongoing discussion. There were probably times when he said, yeah, he wanted to appeal and times when he said he didn't want to appeal.

21

But the final decision he never made until after the imposition of judgment and sentence.

[Tr. Vol. I at 95, 96]. Mr. Ward testified that it was a difficult decision for Mr. Montgomery whether to appeal his case because his family had to liquidate his retirement to pay him; Mrs. Montgomery had to sell their home and move into a smaller home; and his family was emotionally upset. [Tr. Vol. I at 103]. Mr. Ward testified that he informed Mr. Montgomery of his options:

So I explained to Mr. Montgomery, I said, "Okay. Here's what the law says. You have a right to appeal. You may want to hire me, you may want to hire another lawyer. And if you can't afford to hire a lawyer, the court's going to appoint one for you. If you hire me, I'm going to require an additional fee and it's going to be additional hardship on your family. And if you hire another lawyer, it's going to be an additional financial hardship on your family. But if you can't afford [one], the court appoints one for you. Here you're faced with this situation where you're not going to get a sentence reduction. In my opinion, the chances are very slim that this conviction will be reversed on appeal because one of the considerations is, you know, as a lawyer you're not goading the court into making mistakes but you're hoping the court will make mistakes for appellate issues. But the court basically allowed us to conduct the trial as we wanted to conduct it.

[Tr. Vol. I at 104]. Mr. Ward testified that he spoke to Mr. Montgomery about the pros and cons of an appeal on about six occasions throughout the course of his representation. [Tr. Vol. I at 129]. He testified that at the conclusion of their discussions, Mr. Montgomery did not tell him that he wanted him to file an appeal. [Tr. Vol. I at 129]. Mr. Ward testified that after Mr. Montgomery decided not to file an appeal, he remained accessible, except for the ordinary demands of business, and he could have contacted him to file the notice. [Tr. Vol. I at 111]. He further testified that after the appeal time ran, Mr. Montgomery did not contact him to determine why he had not filed the notice. [Tr. Vol. I at 130].

Mr. Montgomery admitted that he had discussions with Mr. Ward regarding his right

to file an appeal, but that Mr. Ward wanted to defer the conversation until after he was sentenced. [Tr. Vol. I at 168]. Mr. Montgomery testified that he told Mr. Ward throughout his representation that he wanted to go to trial and to appeal his case, if convicted. Mr. Montgomery testified that Mr. Ward came to discuss his appeal with him sometime after Christmas, probably a couple of days after Christmas. [Tr. Vol. I at 170]. Mr. Montgomery testified that he told Mr. Ward again at that time that he wanted to appeal. [Tr. Vol I at 171]. He said the reason he wanted to appeal was "because of missing chat records and missing evidence and things of that nature." [Tr. Vol. I at 171]. Mr. Montgomery testified that Mr. Ward responded by merely saying, "The same evidence, same testimony, same results." [Tr. Vol. I at 171].

Significantly, Mr. Montgomery never testified that Mr. Ward outright told him he refused to file a notice of appeal for him. He claimed that when Mr. Ward left, he tried to telephone him but the telephones in the jail were "broke" for eight to ten days, and he was not able to call Mr. Ward. He testified that he sent his wife a letter to have her ask Mr. Ward to call him, but Mr. Ward never returned her calls. [Tr. Vol. I at 171]. However, there was no testimony by Mrs. Montgomery to substantiate this assertion. Mrs. Montgomery testified that she had a difficult time remembering dates, but she recalled discussing an appeal with Mr. Ward after the trial. However, she also testified that she never brought up the subject of an appeal with Mr. Ward. Mrs. Montgomery never testified that she tried to contact Mr. Ward after Christmas at the request of her husband. [Tr. Vol. I at 145]. Mr. Montgomery also admitted that after the expiration of his time to appeal, he never contacted Mr. Ward to ask why he had not filed the notice of appeal. [Tr. Vol II at 40].

A resolution of this issue is primarily a question of credibility due to the contradictory

evidence offered by Mr. Montgomery and Mr. Ward. Mr. Montgomery offered conflicting testimony about his purported efforts to contact Mr. Ward after their final discussion, sometime after Christmas Day, 2007 (Mr. Montgomery's appeal time expired on January 7, 2008). Mr. Montgomery initially claimed that he tried to contact Mr. Ward after Christmas but the jail telephones were broken and remained unusable for eight or nine days. Based on his testimony, presumably the jail house phones were broken sometime around January 3 or 4, 2008. However, Mr. Montgomery also asserted that he attempted to telephone Mr. Ward's office but no one answered the phone. His attempt would have had to occur after the jail house telephones were repaired. If the attempts occurred on January 5 or 6, 2008, a Saturday and Sunday, Mr. Ward's office was likely closed. He claims also that he sent his wife a letter instructing her to contact Mr. Ward. He further testified that Mr. Ward would not return his wife's calls. Mr. Montgomery does not reconcile his testimony that he told Mr. Ward during their final discussion after Christmas that he wanted him to file an appeal with his purported unsuccessful efforts after Christmas to tell Mr. Ward that he wanted him to file an appeal. Further, Mr. Montgomery's complete failure to contact Mr. Ward after the expiration of the filing period impeaches his claim that he had instructed Mr. Ward to file a notice of appeal. The undersigned simply did not find Mr. Montgomery credible.

In contrast, Mr. Ward was credible. As shown above, Mr. Ward did not provide any conflicting evidence, and certain of his testimony was corroborated by other witnesses. Mr. Ward is a seasoned criminal law attorney and former AUSA. He was a prosecutor for 10 years and has been a defense attorney for 25 years. He has tried cases in federal court for more than 25 years, and he is admitted to appear before the Tenth Circuit Court of

Appeals. [Tr. Vol. I at 113-4]. Mr. Ward has handled approximately 40 to 50 appeals as either a prosecutor or defense attorney and is comfortable handling a case on appeal. [Tr. Vol. I at 114]. He testified that he had a "very good" attorney-client relationship with Mr. Montgomery, that Montgomery was cooperative, and that the two communicated very well. [Tr. Vol. I at 114]. When asked if Mr. Montgomery had asked him to file an appeal, Mr. Ward testified, "I would have filed a notice of appeal and then allowed him to either find other counsel, hire me, or get court-appointed counsel, or do what the circuit court of appeals directed me to do." [Tr. Vol. I at 129]. He testified that he had filed many such notices of appeal in other cases [Tr. Vol. I at 129] and that filing a notice of appeal is a very simple process which takes very little time. [Tr. Vol. I at 137]. For the foregoing reasons, the undersigned finds that Mr. Ward's performance in failing to file a notice of appeal was not deficient.

**Credibility Finding**

For a determination that Mr. Montgomery offered credible testimony, the undersigned would be compelled to find that other witnesses, who testified under oath at the evidentiary hearing, were being less than truthful. That list of witnesses would include: Mr. Ward (a former AUSA and a 35 year practicing litigation attorney); Detective Buchanan (a police officer and 3 year FBI task force agent); Agent Carter (a 7 year FBI forensic examiner); Special Agent Cecchini (a 13 year FBI agent); and Mr. Snow (an AUSA). To the contrary, the undersigned found each of these witnesses credible. Thus, the undersigned finds that Mr. Montgomery's testimony was not credible.

**<u>Recommendation</u>**

Mr. Montgomery failed to meet his burden to show that Mr. Ward's performance was deficient in his representation of him, that he has been prejudiced by Mr. Ward's representation, or that the outcome would have been different had Mr. Ward done the very things that Mr. Montgomery claims constitute error. Thus, the undersigned RECOMMENDS that the petition filed by Richard Dale Montgomery for relief under 28 U.S.C. § 2255 [Dkt. # 70] be DENIED.

<u>Objection</u>

In accordance with 28 U.S.C. § 636(b) a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by September 20, 2011.

DATED this 6th day of September, 2011.

_____
T. Lane Wilson
United States Magistrate Judge